STATE OF MISSOURI at the relation of EMPIRE DISTRICT ELECTRIC COMPANY, a Corporation, Appellant, v. PUBLIC SERVICE COMMISSION ET AL.—100 S. W. (2d) 509.

Division One, December 14, 1936.

*A. E. Spencer, Chas. H. Mayer* and *Mayer, Conkling & Sprague* for appellant.

*James P. Boyd*, General Counsel, and *Daniel C. Rogers*, Assistant Counsel, for Public Service Commission.

FRANK, J.—This is an appeal by the Empire District Electric Company, a Kansas corporation, from a judgment of the Circuit Court of Cole County affirming an order of the Public Service Commission. For brevity we will refer to relator as the company and to respondents as the commission.

This cause was instituted by the commission on its own motion against the company to determine the fair value of the company's property. The commission made an appraisal of the company's properties and an audit of its books and accounts. Thereafter hearings were had before the commission as to the value of the company's property and as to the audit of its books and accounts as made by the commission. At such hearing evidence pro and con was heard as to the cost of reproduction less depreciation of the company's used and useful property.

It was further shown at said hearing that the company in the year 1915 voluntarily began the accumulation out of earnings of a depreciation reserve which, by the year 1923 reached the sum of approximately $1,000,000; that in that year the company's board of directors adopted a resolution to the effect that there was an over accrual in the depreciation reserve amounting to $400,000, and said sum of $400,000 was by authority of said board transferred from depreciation reserve to surplus, leaving in the depreciation reserve approximately $864,000; that in the year 1926 another sum of $400,000 was so transferred, leaving in the depreciation reserve at that time the sum of $1,760,000. Again in 1929 the sum of $800,000 was transferred from depreciation reserve to an account called "Special Surplus Reserve" where it still remains, leaving in the depreciation reserve in the year 1930 the sum of $1,226,000; that the $800,000 which was transferred from depreciation reserve to surplus was disbursed in the payment of dividends to the stockholders before the institution of the present proceedings; that each year from 1915 to and including the year 1935, the company made annual reports to the commission which showed the transfer of funds as above indicated.

Other necessary facts will be stated in course of the opinion.

At the conclusion of the hearing, the commission on August 6, 1935, ordered that the $1,600,000 which had been transferred from the depreciation reserve fund be replaced in that fund. The legality of that order is the only question presented for decision on this appeal.

There is no statute requiring the company to carry a depreciation reserve account. However, there is a statute, Section 5200, Revised Statutes 1929, which gives the commission power, after hearing, to

require the company to carry such an account, subject to the control of the commission. That section of the statute reads as follows:

"The commission shall have power, *after hearing*, to require any or all gas corporations, electrical corporations and water corporations to carry a proper and adequate depreciation account in accordance with such rules, regulations and forms of account as the commission may prescribe. The commission may, from time to time, *ascertain and determine and by order fix* the proper and adequate rates of depreciation of the several classes of property of such corporation, person or public utility. Each gas corporation, electrical corporation and water corporation shall conform its depreciation accounts to the rates *so ascertained, determined and fixed*, and shall set aside the moneys *so* provided for out of earnings and carry the *same* in a depreciation fund and expend *such fund* only for such purposes and under such rules and regulations, both as to original expenditure and subsequent replacement, as the commission may prescribe. The income from investments of moneys in *such fund* shall likewise be carried in such fund." (Italics ours.)

The facts show that the commission, at no time, made any order requiring the company to set up or carry a depreciation reserve. The silence of the commission on that subject from 1915 to the date of the present hearing in 1935, necessarily left the question of a depreciation reserve and the upkeep of the property to the judgment of the board of directors of the company. The power of the commission to make orders relative to the depreciation reserve of the company is conferred by statute. We must, therefore, look to the statute to determine whether the commission had authority to make the order in question. It has been well said that "when a particular power is exercised by the commission, or is claimed for it, that power should have its basis in the language of the statute, or should be necessarily implied therefrom." [People ex rel. Railways Co. v. Public Service Commission, 223 N. Y. 373, 119 N. E. 848; Havre de Grace & Perryville Bridge Co. v. Towers, 132 Md. 16, 103 Atl. 319.] Turning to the statute we find that it gives the commission power, after hearing, to make an order requiring the company to carry a depreciation reserve account in an amount fixed by the commission, subject to the regulatory control of the commission. Such an order, if made, would operate prospectively and give the commission regulatory control of the depreciation reserve created by its order. ■ But that is not the situation in this case. Here the commission stood by through the years without making any order requiring the company to set up or carry a depreciation reserve, and by its silence and tacit consent permitted the company to voluntarily accumulate a reserve and use it for such purposes as. in the judgment of the board of directors of the company, was proper. Some years after this was done the commission then made a retroactive

order, the effect of which was to look back through the years and nullify orders made by the company's board of directors relative to the depreciation reserve, when there was no statute or order of the commission which prohibited the making of such orders at the time they were made. This retroactive order was illegal and void because the commission had no authority to make it.

■ Aside from the want of statutory authority to make the order, it is wrong in principle. A depreciation reserve whether accumulated voluntarily or pursuant to an order of the commission, comes from revenues which the customers pay for service and for that reason it belongs to the company. The only purpose of a depreciation reserve, so far as the public is concerned, is to guarantee that the company's property will be kept in proper condition so that efficient service may be rendered. When that purpose is accomplished, the balance remaining in the depreciation reserve belongs to the company, and the company cannot be forced to give it up for the benefit of future customers. Decisions of the Supreme Court of the United States support this conclusion. In Board of Public Utility Comrs. v. New York Telephone Company, 271 U. S. 23, 70 L. Ed. 808, that court, among other things said:

"It may be assumed, as found by the Board, that in prior years the company charged excessive amounts to depreciation expense and so created in the reserve account balances greater than required adequately to maintain the property. It remains to be considered whether the company may be compelled to apply any part of the property or money represented by such balances to overcome deficits in present or future earnings and to sustain rates which could not be otherwise sustained.

"The just compensation safeguarded to the utility by the Fourteenth Amendment is a reasonable return on the value of the property used at the time that it is being used for the public service. And rates not sufficient to yield that return are confiscatory. (Citing cases.) . . . The revenue paid by the customers for service belongs to the company. The amount, if any, remaining after paying taxes and operating expenses, including the expense of depreciation, is the company's compensation for the use of its property. If there is no return, or if the amount is less than a reasonable return, the company must bear the loss. Past losses cannot be used to enhance the value of the property or to support a claim that rates for the future are confiscatory. (Citing cases.) And the law does not require the company to give up for the benefit of future subscribers any part of its accumulations from past operations. Profits of the past cannot be sued to sustain confiscatory rates for the future. (Citing cases.)"

The opinion in this case concludes as follows:

"Customers pay for service, not for the property used to render it. Their payments are not contributions to depreciation or other

operating expenses, or to capital of the company. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company. Property paid for out of money received for services belongs to the company, just as does that purchased out of proceeds of its bonds and stock. It is conceded that the exchange rates complained of are not sufficient to yield a just return after paying taxes and operating expenses, including a proper allowance for current depreciation. The property or money of the company . . . cannot be used to make up the deficiency.''

In the instant case it was the duty of the company to adequately maintain its property so that efficient service might be rendered to its customers. Evidently the amounts transferred from the depreciation reserve were not needed for that purpose. We say this because on the record before us we must assume that the company properly maintained its property and rendered efficient service, because there was no showing to the contrary, and no complaint made as to the condition of the property or the character of service rendered during the time in question. In this situation any amount remaining in the depreciation reserve belongs to the company. The company cannot be forced to leave its own funds in the depreciation reserve for the benefit of future customers, who are themselves supposed to pay a rate for service sufficient to cover depreciation, cost of operation and a fair return to the company during the time they are served.

The commission contends that the company had no authority to withdraw any funds from the depreciation reserve without the consent of the commission, or expend any part thereof for any purpose except as prescribed by the commission. That would be true, if the commission had exercised its regulatory powers, and by order required the company to carry a depreciation reserve, and fixed the amount thereof. But since the commission never attempted to regulate the depreciation reserve, and by its inaction left that question to the judgment of the company, it cannot years afterward by a retroactive order undo what the company has done in the past. If, and when, the commission decides to fix and regulate the depreciation reserve of the company, it must accept the property and funds of the company in the condition in which it finds them at that time, and make regulations for the future. The statute is prospective in its operation and not retroactive.

The commission contends that independent of the Public Service Commission Act it was the duty of the company to carry a depreciation reserve. [Knoxville v. Knoxville Water Company, 212 U. S. 1, is cited in support of this contention.] The cited case does not support the commission's contention, but we need not discuss that question because there was no showing or finding that the company did not carry an adequate and proper depreciation reserve. It is

conceded there was $1,226,000 left in the depreciation reserve after the transfers were made from that account. Moreover it does not appear that there was any complaint of the condition of the company's property or the character of the service rendered during the times in question. In that situation we must presume that the company adequately maintained its property. At the conclusion of the hearing the commission did not fix the value of the property. Concerning the depreciation reserve, it made the following finding:

"We are unable to determine whether or not excessive accruals actually had been placed in the reserve or whether the reserve shown in the books is adequate or inadequate for the needs of the company."

If the commission had regulatory control over the fund voluntarily created by the company, which in our judgment it did not have, still the order would be void because the findings made by the commission would not support it. Conceding, for the sake of argument only, that the commission had authority to require any part of the fund in question to be replaced in the depreciation reserve, certainly it could only require such amount thereof to be replaced as would make the depreciation reserve adequate for the needs of the company. In face of the statement in the commission's order that it could not determine whether the reserve shown in the books was adequate or inadequate for the needs of the company, there was no basis for an order requiring the company to place additional funds therein.

Certain rules of the commission are invoked in support of its contentions. The source of the commission's power is the statute and not its own rules. Since the commission had no statutory authority to make the order in question, no purpose would be served in discussing the provisions of the rules of the commission.

The report and order of the commission reviews the history of the company, and criticizes the methods used in the acquisition of its properties and the manner in which it has conducted its business. Whether the commission was right or wrong in such criticism has nothing to do with the statutory authority of the commission to make the order in question, and for that reason we will not burden this opinion with a discussion of that part of the report.

For the reasons stated, the judgment of the circuit court affirming the order of the commission should be reversed. It is so ordered. All concur, except *Collet, J.*, not sitting.